UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

WILLIE MEADS,             )
                              )
      Plaintiff,         )      Civil Action No. 5: 13-228-DCR
                              )
V.                      )
                              )
LEXINGTON-FAYETTE URBAN  )    **MEMORANDUM OPINION**
COUNTY GOVERNMENT,     )      **AND ORDER**
                              )
      Defendant.     )

*** *** *** ***

Plaintiff Willie Meads' remaining claims arising under the Kentucky Civil Rights Act, K.R.S. § 344.010 *et seq.*, were tried before a jury on April 24 through April 26, 2017. Meads alleges that his former employer, Defendant Lexington-Fayette Urban County Government discriminated against him based on his race and retaliated against him because he had complained of age discrimination. At the conclusion of the plaintiff's case and at the close of all the proof, the defendant moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court reserved ruling on the motions and submitted the case to the jury. In rendering a verdict in favor of the plaintiff, the jury determined that the Urban County Government did not discriminate against Meads based on race, but that it had retaliated against him by firing him because of his complaints of discrimination.

The matter is now pending for consideration of the defendant's renewed motion for judgment as matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure

and for a new trial under Rule 59. [Record No. 105] The motions will be denied because the defendant's arguments to do not support the relief sought under the applicable legal standards.

## I.

Meads learned in late 2011 of a possible employment opportunity with the Urban County Government. [Record No. 102, p. 53][1] He submitted an application and eventually was hired as an "Equipment Operator, Senior" within the Division Waste Management. [Record No. 102, p. 154] Pursuant to the Urban County Government's Code of Ordinances, Unclassified Civil Service employees are required to serve a six-month probationary period. Urban Cnty. Gov. Ordinance §§ 22-13, 21-14(c). [*See also* Record No. 103, p. 252.] This period is used to supervise, counsel, and evaluate new employees, as well as fire probationary employees who do not meet the Urban County Government's standards. Urban Cnty. Gov. Ordinance § 21-4(d). Employees are at-will workers due their probationary status. *See* Urban Cnty. Gov. Ordinance §§ 22-29, 21-44(a). [*See also* Record No. 103, p. 273.]

May 21, 2012, was Meads' first day of employment. [Record No. 102, pp. 70, 73] His primary duty as a senior equipment operator would involve driving a garbage truck in the city for trash collection. The Division of Solid Waste conducted new-driver training classes once per week, typically on Wednesdays. *Id.* New drivers were evaluated and

---

[1] While many of the facts outlined below were contested during trial, the summary provided in addressing the pending motions references the facts that support the plaintiff's version of events.

received a score from an assigned trainer at the end of each training session. A score of nine out of ten was necessary to complete training and to be released to drive a garbage truck on the city streets. *Id.* at pp. 165, 200.

On Meads' first day, Emma Turley, the Division's Safety Coordinator, met with the new employees for orientation. *Id.* at p. 72. Turley oversaw the safety training program and explained that she ran a "tight ship." *Id.* As part of orientation, Turley gave out a list of hand signals and reviewed them with the new employees. *Id.* Meads worked seven to eight hours the following day, riding along a collection route with an experienced driver. *Id.* at p. 73. The following day (May 23, 2012) was Meads' first day of training. *Id.* That morning, Turley asked the new employees whether they had learned the hand signals she had given them previously. *Id.* at p. 74. According to Meads, all of the new employees told Turley "no," and that they had "been busy." *Id.* Meads contends that this caused Turley to fly into a rage. Meads claims that he proceeded to explain that he needed "a little more time," whereupon Turley "threw another fit for about five more minutes." *Id.* Another instructor then taught the class the hand signals.[2]

Turley assigned John Brown to act as Meads' trainer later that morning. *Id.* at p. 74. Meads contends that Turley overheard him telling Brown that he planned to attend an appointment during the lunch hour, but that he "probably [wouldn't] miss any training at all." *Id.* at p. 75. According to Meads, Turley launched into an expletive-filled tirade in which she told Meads that he should report such issues to her rather than Brown. *Id.* Meads

---

[2]  Testimony was presented during trial that Meads generally refused to follow instructions of his superiors but specifically from Turley because she was female.

contends that Turley then called the Director of Waste Management, Steve Feese, and stated, "[w]e've got one here that ain't going to work out. I need you to let him go right now." *Id.* at 76. Meads went to the driving area known as the "test pad" to work with Brown following this incident. *Id.* at p. 76.

Meads testified that he had some trouble with one of the mirrors on his truck and Brown told him, "We didn't do very good today." *Id.* at p. 79. If the statement was actually made, it would clearly have been an understatement due to Meads' poor performance. However, Brown stated that he had seen drivers "a lot worse than [Meads]" and that "everything [would] be okay." *Id.* Meads received a score of two out of ten. He testified that Turley berated him again, stating that he should be more respectful and "[w]e've got things that happen to people like you." *Id.* at p. 80.

There was no training the following week due to the Memorial Day holiday. *Id.* at p. 82. However, Meads attended a meeting on or around May 30, 2012, during which he was approached by several co-workers who told him that they had "heard about [his] situation." *Id.* at p. 84. While Meads was considering their suggestion that he speak with Steve Feese, the individuals "[ran] [Feese] down," telling him "Willie needs to talk to you. He's got a whole lot of problems, same problems everybody has had with Emma Turley." *Id.* at p. 84. Meads then told Feese that he was "the oldest person in class . . . 60 years old. . . . I'm the oldest person that's been in class for a long time. I feel that I'm treated different for those reasons." *Id.* at p. 84. According to Meads, Feese wrote something down and told Meads he would get back in touch with him. *Id.*

Meads heard Turley say something under her breath the following day. *Id.* at p. 85. Others told him that she had referred to him as an "old black dark ass." *Id.* Another co-worker overheard Turley say that Meads was "too old to be working there." [Record No. 103, p. 22] At the next training session on June 6, 2012, Meads claims that Turley assigned a trainer to all of the new drivers except him. Instead, Turley, who was not a day-to-day safety trainer, told Meads, "You're [expletive] coming with me today. I'm training your ass." *Id.* 85-86. Meads further claimed during his trial testimony that Turley refused to provide him with any guidance at the test pad when she told him to inspect his truck. *Id.* Meads contended that he was unsure of how to perform the inspection, but he could hear a trainer giving another trainee instructions nearby. *Id.* at p. 86-88. Meads attempted to listen and inspect the truck accordingly.

Later, Turley instructed Meads to "take the lead" with respect to the road course, so he drove onto the course and proceeded in the wrong direction. *Id.* at p. 88. Shortly thereafter, Turley pulled into Meads' path with a pickup truck, forcing him to stop. *Id.* at p. 89. Unknown to Meads, Turley had been shouting frantically into her two-way radio, instructing him to stop. Meads contended that his truck's radio was turned off, however, so he claims was unable to hear her commands. *Id.* Managers Kelvin Johnson and Kevin Bennett heard Turley's radio transmission from their offices and came to the training pad to assess the situation. [Record No. 103, p. 191][3]

---

[3] Again significantly conflicting evidence was presented on this point. The Urban County Government contends that Meads' radio was operating and that he was laughing at Turley as she attempted to get his attention.

Once Meads stopped the truck, Turley got inside and showed him how to turn on the radio. [Record No. 102, p. 89] By that time, another trainee's truck had passed by, so Meads resumed driving and followed that individual. *Id.* at p. 90. The remainder of the session was relatively uneventful. Trainer Tim Jones worked with the plaintiff at some point, but Turley advised Jones to "let [Meads] figure it out." *Id.* at p. 92. Jones commented at the end of the day that Meads had done much better that session. [Defendant's Ex. 4] But Turley had a less favorable view, having commented that Meads "hit all serpentine barrels" and did "not retain directions given." *Id.* Turley also believed he had "something personal against [her]." [Record No. 102, p. 91] Meads testified that he scored a seven out of ten on his second evaluation.[4] *Id.*

On June 11, 2012, Meads had a two-week evaluation with Senior Program Manager Kevin Bennett. *Id.* at p. 93, 202. According to Meads, Bennett asked him, "[w]hat's going on between you and Ms. Turley?" *Id.* Meads advised Bennett, "[i]n front of everybody I've been attacked several times. I've been referred to by names that I don't even want to mention to you." *Id.* Bennett told Meads that he would look into it. *Id.*

The following day, Turley's "under-the-breath comments got louder and clearer." *Id.* at p. 94. Co-workers began telling Meads that Turley was going to "get rid" of him. *Id.* Shortly thereafter, Meads was called in to speak with Feese and Kelvin Jackson, who was the Operations Manager over collection. *Id.* at pp. 94, 187. Feese told Meads that Turley had reported that Meads was not following instructions and was not doing well on

---

[4] The Vehicle/Equipment Training Assessment Sheet admitted into evidence indicates that Meads received a score of 5. Meads maintains that he received a 7. [Defendant's Ex. 4]

the test course.  *Id.* at p. 95.  Meads disputed several of Turley's comments, including her allegation that he had run over a barrel and trapped it under his truck during training.  *Id.* Feese told Meads that he would look into the issues but, as of that time, he was no longer training.  *Id.* at p. 96.

Following the meeting with Jackson and Feese, Meads went to the Urban County Government's central office and expressed that he was having "all kinds of age-related problems" at work.  *Id.* at p. 96.  He was told that he would need to complete a grievance form and submit it to his immediate supervisor, Darryl Clay.  *Id.* at p. 97-98.  Meads submitted a grievance form to Clay on June 13, 2012, which stated simply "age discrimination—not sure."  *Id.* at 98.  Clay returned the form to Meads two days later, stating that "they" said Meads had not been employed long enough to file a grievance.

On June 18, 2012, Turley sent an e-mail to Bennett and Feese that began "Mr. Willie Meade [sic]/serious concerns."  [Defendant's Ex. 26]  Turley described her "serious safety concerns" regarding Meads, as well as his "negative actions in the workplace" that had taken place on May 23 and June 6, 2012.  *See id.*  The following day, Feese forwarded the e-mail to Human Resources Manager Ashley Case, and requested Meads' termination.  *Id.* Unaware of his imminent discharge, Meads reported for training on June 20.  *Id.* at p. 98. However, Jackson advised Meads that he would not be permitted to train that day, but he could return to work the following day.  *Id.*  Shortly thereafter, Meads went to the Lexington-Fayette County Human Rights Commission and filed a charge alleging age, sex, and disability discrimination.  *Id.* at p. 100.

Approximately one week later, Meads returned to the Urban County Government's central office and filed a complaint of age and sex-related discrimination. *Id.* at p. 101. Ashley Case took Meads' statement but determined that his allegations did not warrant further investigation. Although a termination letter had already been drafted, Meads was not formally notified of this decision until a week later. *Id.* at p. 104. Meads was provided a standard letter advising him that he was an at-will probationary employee and his services were no longer needed. [Defendant's Ex. 11]

## II.

Judgment as a matter of law is appropriate only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" regarding a particular issue. Fed. R. Civ. P. 50(a)(1). It may only be granted "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsey v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012). The Court may not "reweigh the evidence, question the credibility of witnesses, or substitute [its] own judgment for that of the jury." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016).

Stated differently, judgment as a matter of law is appropriate only when "there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001). Although the Court reviews the record as a whole, it disregards all evidence favorable to the moving party that the jury is not required to believe. *Williams v. CSX*

*Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

A new trial may be warranted under Federal Rule of Civil Procedure 59(a) "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This may be when a jury has reached a "seriously erroneous" result, as evidenced by "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015). A party's failure to object to a particular issue does not waive its right to seek a new trial, but "the degree of prejudice required to obtain a new trial . . . is higher in the absence of objections at trial." *See Strickland v. Owens Corning*, 142 F.3d 353, 358-59 (6th Cir. 1998).

Finally, the Court cannot set aside the jury's verdict simply because it thinks another result is more justified. *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 534 (6th Cir. 2014).

### III.

The Kentucky Civil Rights Act ("KCRA") prohibits an employer from discharging or otherwise discriminating against an individual because of the individual's race, color, sex, or age (forty and over). K.R.S. § 344.040. It also prevents employers from retaliating against an employee because he has opposed a practice declared unlawful by the KCRA, or because he has filed a charge or otherwise participated in the enforcement of the KCRA. § 344.280(1). *See also Brooks v. Lexington-Fayette Urban Cnty. Housing Auth.*, 132

S.W.3d 790, 801 (Ky. 2004). The *prima facie* elements of retaliation consist of: (1) the plaintiff engaged in a protected activity; (2) the plaintiff was disadvantaged by an act of his or her employer; and (3) there was a causal connection between the protected activity and the employer's act. *Ky. Dep't of Corrs. v. McCullough*, 123 S.W.3d 130, 133-34 (Ky. 2003).

### A. Meads' Complaints of Discrimination

The Urban County Government contends that there was insufficient evidence for a reasonable jury to conclude that Meads engaged in a protected activity under the KCRA. Specifically, it argues that Meads' complaints of age discrimination were too vague to trigger the "opposition clause" of the act. [Record No. 105, p. 9] However, it is well established that an employee need not file a formal complaint to engage in protected activity. *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007). Instead, it is the assertion rights under the KCRA that triggers protection under the anti-retaliation provision. *Id.* Accordingly, an employee's communication to his employer that he believes the employer has engaged in employment discrimination almost always constitutes protected activity. *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 276 (2009). *But see Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313-14 (6th Cir. 1989) (employee's claim of "ethnocism" too vague trigger opposition clause). *See also Fox*, 510 F.3d at 591 (6th Cir. 2007) (vague charge that employer was "out to get" employee was insufficient to constitute opposition to unlawful employment practice).

Unlike the plaintiffs in *Booker* and *Fox*, Meads met personally with the director of his division and reported that he was being treated differently because he was "the oldest

in the class." The meeting was unconnected with any performance issues and, based on the testimony at trial, the discrimination charge was the only matter discussed. Although the complaint submitted to Clay was not explained with particularity, it was written on a grievance form and clearly stated "age discrimination." An employee's complaints need not "be lodged with absolute formality, clarity, or precision." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)). Viewing the evidence in the light most favorably to Meads, his actions were sufficient to put the defendant on notice that he was contesting an unlawful employment practice.

To obtain retaliation protection under K.R.S. § 344.280(1), an employee must have "a reasonable and good faith belief that the adverse employment practices [he] opposed were KCRA violations." *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 580 (Ky. 2016) (internal quotation marks omitted); *Asbury Univ. v. Powell*, 486 S.W.3d 246, 262 (Ky. 2016). *See also Wasek v. Arrow Energy*, 682 F.3d 463, 469 (6th Cir. 2012). The Kentucky Supreme Court has made clear that a plaintiff alleging retaliation under the KCRA is not required to plead or affirmatively prove that he acted in good faith when he opposed a practice declared unlawful under the KCRA. *Charalambakis*, 488 S.W.3d at 580. Instead, a plaintiff is entitled to a presumption of good faith, which the defendant may rebut to demonstrate that the plaintiff did not actually oppose an unlawful practice. *Id.* For example, the defendant may introduce evidence to show that the plaintiff, acting in bad faith, fabricated a civil rights claim. *Id.* at 581. During trial, however, the Urban County Government failed to present any significant evidence regarding Meads' underlying

discrimination claims. The defendant did not ask Meads any questions about his complaints and Darryl Clay was not called to testify. And while Feese remembered talking to Meads, he did not recall the content of the conversation. [Record No. 103, p. 224]

Whether an employee's complaints are based on a reasonable and good faith belief that the opposed practices were unlawful includes both subjective and objective components. *Yazdian*, 793 F.3d at 646. The complaining employee need not be correct in his allegation of discrimination, but it must be based on a sincere belief. *Id. See also De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 857 (5th Cir. 1982). The objective inquiry asks whether "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee" would believe that the challenged conduct was unlawful. *Yazdian*, 793 F.3d at 646. Objective reasonableness is decided as a matter of law "only when no reasonable person could have believed that the facts known to the plaintiff amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring." *Id.* (citing *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015)).

Assuming *arguendo* that Meads was the oldest member of his class, this alone is not a reasonable basis to infer that any negative treatment he received was the result of discrimination. *See Almond v. ABB Indus. Systems, Inc.*, 56 F. App'x 672, 678 (6th Cir. 2003) ("[T]he mere fact that a terminated employee is the oldest in his department is insufficient to create suspicious circumstances under the ADEA."). Further, Turley's age-related comments are relatively minor, particularly when it is considered that Meads did not hear her make the statements. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232,

239 (6th Cir. 2005) ("[C]omments that are vague, ambiguous or isolated do not support a finding of discrimination and cannot be used as direct evidence to establish that an adverse action was motivated by discriminatory intent."). However, when Meads reported his discrimination claims to Ashley Case on June 28, 2012, he provided other reasons he believed he had been discriminated against based on his age.[5] [Defendant's Ex. 9] The defendant was required to offer some evidence, *or at least raise the issue*, of bad faith to trigger Meads' obligation to introduce additional evidence of reasonableness and good faith. Instead, the defendant focused on its legitimate, non-discriminatory reason for firing Meads, which is a separate consideration. Additionally, whether Meads had a good faith belief that he was being discriminated against is largely a credibility determination. *Xu-Shen Zhou v. State Univ. of N.Y.I.T.*, 4 F.Supp.3d 404, 418 (N.D.N.Y. 2014) (rev'd on other grounds).

Here, the jury had evidence upon which it could conclude that Meads had a good faith basis for his complaints.

## B.  Causation

The Urban County Government also argues that the evidence offered during trial does not establish a causal connection between Meads' protected activity and his termination. [Record No. 105, p. 12] "An adverse employment decision that predates a

---

[5] For example, Meads reported that during his first day of training, the younger employees also did not know the hand signals, but Turley's anger was focused at him. Turley also asked if Meads had "ever worked under a woman," implying that he "lived back in the 19th century." He also reported that Kelvin Jackson advised him that "Rosy the Riveter went to work in 1941," implying that he was old. [Defendant's Ex. 9]

protected activity cannot be caused by that activity." *Charalambakis*, 488 S.W.3d at 584

(quoting *Muñoz v. Sociedad Española De Auxilio Mutuo Beneficiencia De Puerto Rico*,

671 F.3d 49, 56 (1st Cir. 2012)). Accordingly, the Court considers only the complaints to

Feese and Clay, as the other complaints of discrimination post-date Feese's June 19, 2012

decision to terminate Meads.

Contrary to the defendant's argument, the jury reasonably could have inferred that

Turley learned of Meads' oral complaint to Feese prior to the second training session on

June 6, 2012. While there was no direct evidence that Feese discussed the complaint with

Turley, the record indicates that the two were in close communication *via* phone and e-

mail during this period. Further, Turley's treatment of Meads became increasingly abusive

during his second training session. It was during this session that Turley singled-out Meads

by refusing to assign him a trainer (according to Meads). And, according to Meads, she

set him up for failure by forcing him to drive without adequate instruction and causing a

dramatic scene when he made a mistake.

The jury also could have inferred that Turley learned of the comments Meads made

during his two-week evaluation with Kevin Bennett. [Record No. 102, p. 93] While the

exact nature of the allegations is unclear, Meads told Bennett that Turley had called him

names he did not "want to mention." *Id.* The following day, Turley began making

comments about Meads under her breath and co-workers told Meads that Turley was

"getting rid of [him]." *Id.* at p. 94. Shortly thereafter, on June 12, 2012, Jackson and Feese

advised Meads that his training was suspended. The next day, Meads submitted a

grievance form to his immediate supervisor Darryl Clay in which he reported "age

discrimination—not sure." Meads contends that Clay told him he would "take it up there to them," but he returned the form a few days later, stating that "they" said Meads had not been employed long enough to file a grievance. [Record No. 201, p. 98] The jury could have concluded based on Meads' testimony that individuals in upper management were aware of the grievance.

On June 18, 2012, Turley sent an e-mail to Bennett and Feese describing her concerns with Meads. [Defendant's Ex. 26] Feese placed a request for Meads' termination on June 19, 2012. The defendant contends it had legitimate, non-discriminatory reasons for firing Meads. Specifically, it offered testimony that Meads was disrespectful, failed to follow instructions, and had difficulties operating the garbage truck. And there was substantial evidence presented to support all of these claims. However, a plaintiff can show that a defendant's proffered legitimate, non-discriminatory reasons were actually pretext for discrimination in three ways: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's action; (3) or that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). The Sixth Circuit has acknowledged that these categories overlap significantly and, at bottom, the question is always: "Did the employer fire the employee for the stated reason or not?" *Id.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

It appears that the Urban County Government's proffered reasons for firing Meads had a significant basis in fact. Meads concedes that he had some problems driving the

garbage truck. His first day, he claims that problems with a vibrating mirror caused him trouble. During his second training session, he continued driving despite Turley's commands to stop because he contends that could not hear her (although there is evidence that Meads was laughing as Turley tried to get him to stop his truck). Meads also acknowledged that, during the first day of training, he spoke back to Turley to advise her that the class needed additional time to learn the hand signals. And Meads actions during trial would give the clear impression that he does not follow instructions and is very rude and disrespectful when he does not get his way. However, according to each of Meads' witnesses, Turley did not tolerate employees speaking back in any way. Meads had not realized that members of the class were not "supposed to say anything at all" to Turley. [Record No. 102, p. 76] And several co-workers testified that they never observed Meads behave in a disrespectful manner or refuse to follow directions. [Record No. 102, pp. 191-92; Record No. 103, pp. 26; 44-45; 58-59]

Meads and each of his witnesses testified that Turley generally treated employees poorly. Meads' brother Jeffrey Jones, who was a safety trainer, testified that Turley "mistreated everybody . . . from beginning to end." [Record No. 103, p. 51] Another employee, Theresa Sanders, believed that Turley was "a nasty person" who "[did] not respect anyone," regardless of age or race. [Record No. 103, p. 9, 19-20] Equipment operator Willetta Cowan was more measured, describing Turley as "very stern." [Record No. 103, p. 59] According to Cowan, Turley "didn't want you to comment back on anything that she instructed you to do or how to do it." *Id.*

Regardless of this testimony concerning Turley's general treatment of employees, it was within reason for the jury to conclude that the defendant's proffered reasons were insufficient or that the reasons did not actually motivate the decision to fire Meads. Despite Meads' difficulties during his second training session, his score improved. Turley testified at trial that Meads' failure to obey her command was extremely alarming because he could have "injured [or] possibly killed" a co-worker. [Record No. 103, p. 94] Despite this, she approved the evaluation form which included the improved score and Tim Jones' positive feedback. [Defendant's Ex. 4] No action against Meads was taken at that time and, at the conclusion of the session, there was no indication that Meads' training would not continue. The jury could have concluded based on all the evidence presented that Meads' intervening complaints of discrimination led Turley to make the recommendation for termination twelve days later, which Feese carried out the following day.[6] *See, e.g., Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350-51 (6th Cir. 2012) (supporting the notion that Turley's discriminatory animus can be imputed to Feese).

Meads presented testimony from Division of Solid Waste employees which suggested that the defendant's stated reasons for firing him were pretextual. Timothy Burnett, who had worked for the Urban County Government for several years, testified that no one else had been disciplined for an accident or similar incident on the training pad.[7]

---

[6] In the e-mail to Ashley Case requesting Meads' termination, Feese stated that he had personally observed Meads' "strange behavior." When Meads questioned Feese about this statement during trial, Feese testified that he observed Meads "off to [him]self" during an unspecified divisional safety meeting. [Record No. 103, p. 233]

[7] Theresa Sanders recalled white probationary employees having been fired for running over

[Record No. 102, p. 180, 193]  Burnett explained that "people hit those things all the time." *Id.* at p. 193.  He further stated, "that [is] what the training pad is for."  *Id.*  Phillip Alcorn (who was present for a significant portion of Meads' first day of training) testified that Meads "didn't do nothing nobody else in there didn't do," and that he "[didn't] see the reason for [Meads'] termination."  [Record No. 103, p. 25, 29-32]

Finally, temporal proximity alone is insufficient to establish causation unless the "adverse employment action occurs very close in time after [the] employer learns of a protected activity."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  Here, because Meads was terminated less than a month after complaining of discrimination, the jury could have reasonably concluded that the there was a causal connection between the two events.  *Meads v. Lexington-Fayette Urban Cnty. Gov't*, No. 5310, p. 4 (6th Cir. Jan. 20, 2016) (citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014)).

## C.     Motion for Hearing on Damages or New Trial

A trial court may remit a verdict when, after reviewing all evidence in the light most favorable to the prevailing party, it is convinced that the verdict is "clearly excessive, resulted from passion, bias or prejudice, or is so excessive or inadequate as to shock the conscience of the court."  *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990) (citations omitted).  When remittitur is appropriate, the court must offer the party

---

cones on two occasions, but she did not state their ages.  [Record No. 103, p. 10, 17]

awarded damages the choice of a new trial or the amount of the court's remittitur. *Id.* at 1396 (citing *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 976 (6th Cir. 1974)).

The plaintiff sought lost wages and damages for emotional distress sustained as a result of his termination. Back pay includes all damages incurred as a result of wrongful termination until the trial date. *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 918 (Ky. Ct. App. 2006). Wrongfully terminated employees have a duty to mitigate damages by exercising reasonable diligence to secure other comparable work. *Id.* (emphasis added). Generally, the defendant has the burden of proving that the plaintiff has failed to discharge this duty. *See, e.g., Burton v. Zwicker & Assocs., PSC*, 978 F.Supp.2d 759, 771-72 (E.D. Ky. 2013) (collecting cases).

Although Meads testified that he gained employment about a year after the defendant fired him, details regarding his new position were not offered into evidence. Most importantly for purposes of calculating damages, *the defendant did not ask Meads how much he was paid at his new job.  See Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994) (While "the jury must consider mitigation of damages when such evidence is presented, the jury has no obligation to create such figures out of thin air."). *But see Hance v. Norfolk So. Ry. Co.*, 571 F.3d 511, 520-521 (6th Cir. 2009) (when plaintiff gave vague testimony about post-termination income, burden shifted to defendant to show that back-pay should be reduced). Amazingly, the Urban County Government's attorney did not address this topic while cross-examining Meads during trial.

Prior to the commencement of trial, the Urban County Government submitted a proposed instruction which asked the jury to reduce any award of lost compensation by

"what [Meads] actually earned from the time his employment was terminated until [the] date of trial" or "what he could have earned by reasonable effort from the time his employment was terminated until the date of trial." [Record No. 66 at pp. 20] Fair enough. Had Meads been asked about his earnings from his subsequent jobs, the requested instruction would have been given. However, the Court declined to adopt the proposed instruction *because no evidence had been introduced to support it*. [*See* Record No. 104, p. 3.] And following the Court's explanation during the instructions conference, *the Urban County Government did not object to the final jury instructions*. *See, e.g., Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 737 (6th Cir. 2016) (objecting party must object to instructions "before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection").

After the Court instructed the jury, Meads made a closing argument in which he stated that he made $11.00 per hour working for the Red Cross. [Record No. 104, p. 32] Although the Urban County Government remained silent on this point during its closing, it now argues that the Court had a duty to instruct the jury regarding mitigation based on this statement. Alternatively, it contends that the Court should have made a "post-trial setoff" to reduce the jury's award of $197,600.00.

With respect to the jury instructions, unsworn remarks made in the parties' closing arguments do not constitute evidence. The jury was cautioned accordingly on multiple occasions. And while courts are authorized to preclude double recovery where duplication of damages is apparent, *see Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1079 (10th Cir. 2008), the defendant has failed to provide any

authority for its suggestion that *sua sponte* reduction of the jury's verdict would have been appropriate in this case.

Simply put, this Court is "sharply limited" in its ability to remit a jury verdict. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004). The award should be maintained unless the award is "beyond the range supportable by proof . . . or the result of mistake." *Bickel v. Korean Air Lines, Co.*, 96 F.3d 151, 156 (6th Cir. 1996). Here, the award is supported by the proof that was presented at trial (*i.e.*, that Meads' starting pay rate at the Urban County Government was $18.50 per hour and that he was fired June 29, 2012).[8] And while Meads' evidence regarding emotional damages would not support a sizeable award, the jury reasonably could have awarded some damages based on Meads' testimony concerning the emotional harm he experienced as a result of his termination. *Cf. Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1108 (6th Cir. 1984). Although it is likely that the damages exceed the amount of Meads' actual lost wages, the award is supported by the proof presented at trial and it is not so excessive as to shock the conscience. In summary, the Urban County Government could have reduced the ultimate damage award by addressing the topic with the jury but, for whatever reason, it failed to do so. And it is not proper for the Court to use remittitur to afford the defendant relief from its stunning failure to address the issue during presentation of proof.

Rule 59 of the Federal Rules of Civil Procedure has generally been interpreted as allowing a new trial on all or some of the issues when the jury reaches a "seriously

---

[8] Apparently Meads was paid through July 3, 2012. [Record No. 103, p. 281] He alluded to a pay raise received on July 1, 2012, but the increased rate was not specified.

erroneous result" due to "(1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509 (6th Cir. 2013) (internal quotation marks and citations omitted) (alteration in original). Although the Court's discretion to grant a new trial is greater than its discretion to grant a motion for judgment as a matter of law, a new trial should only be permitted when the verdict clearly is against the weight of the evidence. *See Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007). While the evidence in favor of the jury's verdict is not overwhelming, as previously explained, it is sufficient. The Court may not substitute its judgment for that of the jury. This is particularly true where, as here, the issues are heavily dependent on the jury's credibility determinations. *See, e.g., Wallace v. FedEx Corp.*, 764 F.3d 571, 593 (6th Cir. 2014).

The defendant also contends that it was prejudiced by the introduction of certain evidence during trial. [Record No. 105, p. 25] To warrant a new trial based on cumulative error, however, a party must show that the errors rendered the trial fundamentally unfair. *Mich. First Credit Union v. Cumis Ins. Soc., Inc.*, 641 F.3d 240, 251 (6th Cir. 2011). Further, a new trial will not be granted on "grounds not called to the court's attention during the trial unless the error was so fundamental that a gross injustice would result." *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 343 (6th Cir. 1993). *See also Park West Galleries, Inc. v. Hochman*, 692 F.3d 539, 548 & n.5 (6th Cir. 2012).

The defendant alleges that Meads "continuously made unfavorable, disparaging, and totally unfounded accusations and remarks designed to cast aspersions upon the

character and integrity of [the defendant] and its employees." [Record No. 105, p. 31 (citation omitted)] Specifically, it cites the following: Meads' testimony that Feese had been indicted for embezzling $2 million from the defendant; Meads' suggestion that witnesses John Brown and Tim Jones had received pay raises in exchange for their cooperation; and Meads' attempt to solicit testimony that Turley had engaged in sexual relationships with trainees. The defendant also contends that Teresa Sanders' testimony regarding the defendant's punishment of employees was "blatantly prejudicial."

The defendant failed to object during trial with respect to Meads' questions regarding Brown's and Jones' pay raises. [Record No. 103, p. 166, 185-86] Further, each of these witnesses explained that any raises were based on promotions. *Id.* There is also no indication that the cited portion of Sanders' testimony was prejudicial to the defendant. Instead of painting the Division of Waste Management of "punitive and thuggish," as the defendant contends, Sanders' statements tended to show that there were consequences when employees did not follow the rules. Accordingly, the testimony could just as easily have favored the defendant, suggesting that Meads had simply been fired for failing to follow the rules.

Meads attempted to introduce evidence that Turley had sexual relationships with employees at the Division of Solid Waste and that she treated these individuals favorably.[9] Specifically, on cross-examination, Meads asked Turley whether she had a relationship

---

[9] Meads previously made a claim of sex discrimination based on the theory that he was less "sexually favorable" than other employees. Summary judgment was granted in favor of the defendant. [Record No. 49] *See also Meads*, No. 15-5310, p. 8 (6th Cir. 2016).

with his classmate and "passed him right on," despite a poor evaluation. [Record No. 103, pp. 123-24] The jury was instructed to disregard the question. In a similar vein, Meads asked Tim Jones whether he and Turley were involved in a sexual relationship. *Id.* at p. 184. Again, the witness was instructed not to answer and Meads was admonished regarding the improper subject matter.

While irrelevant to the claims that remained pending at the time, Meads' questions regarding sexual relationships were not so unduly prejudicial as to warrant a new trial. They were not evidence, merely questions, which the jury was repeatedly directed to disregard. The Urban County Government did not seek a mistrial based on Meads' improper questions. Further, the suggested activity does not bear on truthfulness. It is not the type of comment the jury would be unable to put out of their minds despite of the Court's instructions to do so.

Finally, the defendant objected to Meads' direct testimony regarding Feese's alleged indictment for embezzlement.[10] [Record No. 102, p. 103] The Court sustained the objection and admonished the jury to disregard the statement. *Id.* When a witness makes an unprompted, inflammatory statement to the jury, instructions to the jury to disregard the statement will ordinarily cure any error. *See United States v. Ursery*, 109 F.3d 1129, 1133 (6th Cir. 1997). *See also United States v. Dorman*, 108 F. App'x 228, 246 (6th Cir. 2004) ("[T]o warrant a new trial, 'blurt outs' must be flagrant and pervasive.") (citation omitted).

---

[10] Timothy Burnett briefly testified that Feese was part of an "ongoing investigation." [Record No. 102, p. 196] The defendant's objection was sustained before Burnett had an opportunity to elaborate.

A new trial is warranted only when the material is of "exceptionally prejudicial character, such that its withdrawal from consideration by the jury cannot be expected to remove the harm." *See United States v. Carr*, 5 F.3d 986, 992-93 (6th Cir. 1993).

While Meads' statement was potentially damaging to Feese's credibility, the defendant has not shown that the isolated comment was exceptionally prejudicial. In most respects, Feese's testimony was not inconsistent with Meads' version of events. Feese did not deny that Meads had come to him with a complaint or that he was aware of complaints when Meads was fired. Instead, he simply did not recall because it had been several years since Meads' employment. [Record No. 103, pp. 223-27] Even if the jury fully credited Feese's testimony, it reasonably could have concluded that events transpired in the manner Meads alleged.

Based on the foregoing, there is no indication that the cumulative effect of these comments interfered with substantial justice or that a new trial is otherwise warranted.

## IV.

Accordingly, it is hereby

**ORDERED** that Defendant Lexington-Fayette Urban County Government's oral motion for judgment as a matter of law made during trial, its renewed motion for judgment as a matter of law (directed verdict and judgment notwithstanding the verdict) and motion for a new trial [Record No. 105] are **DENIED**.

This 10th day of July, 2017.



Signed By:

*Danny C. Reeves*

**United States District Judge**